UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
BOWLING GREEN DIVISION
CIVIL ACTION NO. 1:18-CV-00039-GNS-HBB


AMITY M. KOCH                                                        PLAINTIFF

v.

THAMES HEALTHCARE GROUP, LLC                                         DEFENDANT


## MEMORANDUM OPINION AND ORDER

This matter is before the Court on Defendant's Motion for Summary Judgment (DN 24) and Motions in Limine (DN 25, 26) and Plaintiff's Motions in Limine (DN 27). For the reasons that follow, Defendant's motion for summary judgment is **GRANTED**, and all other motions are **DENIED**.

## I.      BACKGROUND

Plaintiff Amity Koch ("Koch") brings this action against Defendant Thames Healthcare Group, LLC ("Thames") asserting claims of disability discrimination and retaliation under the Kentucky Civil Rights Act ("KCRA"), Kentucky Revised Statute ("KRS") Chapter 344, and interference and retaliation claims under the Family Medical Leave Act ("FMLA"), 29 U.S.C. §§ 2601-2654. (Compl. ¶¶ 18-31, DN 1-2).

Koch was first employed by Thames as nurse on April 5, 2016, at its Greenwood Nursing and Rehabilitation Center ("Greenwood"). (Def.'s Mot. Summ. J. Ex. B, at 2, DN 24-3; Pl.'s Resp. Def.'s Mot. Summ. J. 3, DN 32). On June 28, 2016, Koch received a final disciplinary warning for which she was given a 30-day probationary period based on her chronic absenteeism and for other general conduct. (Def.'s Mot. Summ. J. Ex. B). The notice stated:

> Employee has had 3 absences and 2 tardies since hire date on April 5 2016. It is
> important that employee be at work and be on time. Any further absence or tardy

1

in the next 30 days will result in automatic termination. Please be aware of how you talk [to] other staff members. All staff are expected to treat each other with dignity and respect.

(Def.'s Mot. Summ. J. Ex. B, at 2).

On September 1, 2017, Greenwood's Director of Nursing, Amanda Steffey ("Steffey"), prepared a memorandum regarding attendance issues which Koch had experienced in January 2017:

> The last day actually worked by employee, Amity Koch RN, during her first hire at Greenwood Nursing and Rehab was Saturday, January 28th 2017.
>
> Employee had been working night shift for several weeks after she had requested to step down from being the weekend treatment nurse. She accepted an open position as an RN on our Long Term Care unit for 11p-7a. Employee had started that position on Tuesday, January 3rd 2017 as agreed to. Amity continued to work that position until Friday, January 20th 2017 when she requested to be PRN because she did not wish to be full time anymore. Amity did work approximately 20 more hours at the facility after that date up to January 28th 2017.
>
> All employees are scheduled to do change over at the end of each month. This entailed coming in to the facility and checking Medication Administration Records for the next month. Employee was scheduled for routine change-over assignments on January 31st 2017 and employee refused to perform her duties. When the Assistant Director of Nursing contacted her via text, employee responded stating, "I told Margaret I would be busy thru the end of the month." After speaking with Margaret, staff facilitator, she had no record of employee being out of town or requesting off during that time period.
>
> Amity was made aware that she had not notified anyone that she would be [un]able to perform her duties. Amity responded, "I've limited the amount of time spen[t] in helping this facility out with incompetence." After this, employee did not work any hours to continue employment. Per policy, after 30 days of not having hours worked, employee is terminated from the system.
>
> Employee was not terminated by facility due to disciplinary actions etc.

(Def.'s Mot. Summ. J. Ex. A, at 2, DN 24-2; Pl.'s Resp. Def.'s Mot. Summ. J. 3).

Koch did not work at Greenwood from late January until April 2017, when she returned and "was placed on a probationary period upon rehire for her absenteeism." (Steffey Dep. 36:24-

37:5, 72:25-73:7, May 16, 2019, DN 32-4).  On April 28, 2017, Koch received another disciplinary warning and was suspended for two days for leaving work without permission.  (Def.'s Mot. Summ. J. Ex. E, at 2, DN 24-6).  On July 31, 2017, Koch was counseled because she had three or more unexcused absences and was advised that she would have to bring in a doctor's note for absences.  (Def.'s Mot. Summ. J. Ex. D, at 2, DN 24-5).

On August 14, 2017, Koch was scheduled to work but did not show.  (Def.'s Mot. Summ. J. Ex. H, at 2, DN 24-9).  Instead she sent a text message to Steffey at 7:24 a.m. that Koch had an appointment for EMG testing at 8:30 that morning.  (Def.'s Mot. Summ. J. Ex. J, at 2, DN 24-11; Steffey Dep. 27:1-9; Koch Dep. 118:6-119:23, Feb. 11, 2019, DN 24-10).  Steffey asked what time Koch would be at work that day, to which Koch replied, "Right after it's done, they said it doesn't take long[.]"  (Def.'s Mot. Summ. J. Ex. J, at 2).  Koch did not communicate further with Steffey and did not report to work at all that day.[1]  (Def.'s Mot. Summ. J. Ex. J, at 2).

Koch was scheduled to work on August 15, but did not report to work that day either.  (Def.'s Mot. Summ. J. Ex. H, at 2).  Koch's phone records show a one-minute call to Steffey's number that day at 6:52 a.m.  (Def.'s Mot. Summ. J. Ex. R, at 4).  Steffey denies having spoken to Koch at that time or receiving a message from her, but conceded that poor cellular service at her home may have prevented the call from going through.  (Steffey Dep. 67:1-10).  Koch claims that she told Steffey that she "wouldn't be coming in the rest of th[e] week[,]" but there is nothing to

---

[1] Screenshots of text messages from Steffey and Koch's phone reveal discrepancies.  According to the screenshots of text messages on Steffey's phone, she messaged Koch on August 14 at 12:44 p.m. stating, "Are you coming in?" and at 4:57 p.m. that day asking, "What happened today?"  (Def.'s Mot. Summ. J. Ex. J, at 2).  According to screenshots from Koch's phone, she received these messages at 6:37 a.m. on an unknown date because the date is not depicted on the screenshots.  (Pl.'s Resp. Def.'s Mot. Summ. J. Ex., at 3, DN 32-8)  That being said, Koch's phone records indicate that she received two messages from Steffey at 12:44 p.m. and 4:58 p.m. on August 14.  (Def.'s Mot. Summ. J. Ex. R, at 2, DN 24-19).  Koch admitted that she did not otherwise contact Greenwood on that day.  (Koch Dep. 125:4-6).

3

indicate that Koch gave a reason for that absence. (Koch Dep. 142:21-143:4). Steffey filled out a disciplinary notice indicating Koch would be discharged for chronic absenteeism and her failure to notify her supervisor for one of the absences, but did not officially submit that form. (Def.'s Mot. Summ. J. Ex. O, at 2, DN 24-16). Steffey had daily conversations regarding Koch's absenteeism with Greenwood Administrator Jonathan McGuire ("McGuire"), who was responsible for making firing decisions. (Steffey Dep. 18:9-12, 29:24-30:2). While the August 15 disciplinary notice stated Koch would be fired after two no-call/no-shows, Steffey hoped that Koch would contact her before the formal termination occurred. (Steffey Dep. 26:7-10, 27:22-28:4, 39:21-25).

Koch was also scheduled to work on August 16, 2017, but again did not show up. (Def.'s Mot. Summ. J. Ex. H, at 2). Koch claims she sent Steffey a text message at 6:27 p.m. that day, stating: "I've been afraid to leave my house this week. My NP put me on a $1000/mo. med and ran out of samples, it hit me hard Sunday."[2] (Pl.'s Resp. Def.'s Mot. Summ. J. Ex., at 3, DN 32-8; Def.'s Mot. Summ. J. Ex. R, at 3). Screenshots of Steffey's text messages do not reflect this message and Steffey denied receiving it. (Def.'s Mot. Summ. J. Ex. J, at 2-4; Steffey Dep. 56:14-20, 83:11-16).

Koch was also scheduled to work on August 17, 2017, and again did not show up. (Def.'s Mot. Summ. J. Ex. H, at 2). Steffey completed another written disciplinary notice due to Koch's failure to work as scheduled on August 14-16 indicating that Koch would be terminated for those absences. (Def.'s Mot. Summ. J. Ex. L, at 2, DN 24-13). This time, after a discussion with

---

[2] Although Koch asserts that she sent that text message on August 15, her phone records show a text message sent to Steffey on August 16 but no messages to Steffey on August 15. (Def.'s Mot. Summ. J. Ex. R, at 2-3).

McGuire and Assistant Director of Nursing Nicole Jessie ("Jessie"), Steffey submitted Koch's termination paperwork to human resources. (Steffey Dep. 27:22-29:6).

Koch sent a text message sent to Steffey at 5:50 p.m. on August 17 asking: "Can I come back?" (Pl.'s Resp. Def.'s Mot. Summ. J. Ex., at 3, DN 32-8; Def.'s Mot. Summ. J. Ex. R, at 7). Steffey testified that she attempted to call Koch three separate times between August 14 and 18, but believed that Koch blocked her number. (Steffey Dep. 62:19-64:23). On August 18, 2017, Koch left a letter on Steffey's desk from Koch's medical care provider, APRN and PMHNP Cindy Lemon ("Lemon"), stating:

> I have been seeing Amity for ADHD and Major Depressive disorder and providing medication management/individual psychotherapy. During the time we have been waiting on insurance to pay for her medication, we were also out of samples and were unable to provide her with her medication. We are now able to provide the medication and ask that you please excuse Amity Koch from work for dates August 14, 2017 to August 18, 2017.

(Pl.'s Resp. Def.'s Mot. Summ. J. 11; Def.'s Mot. Summ. J. Ex. P, at 2, DN 24-17; Steffey Dep. 26:11-15). Koch sent text messages to Steffey on August 18 and 19 asking if Steffey had received the letter. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex., at 4, DN 32-8; Def.'s Mot. Summ. J. Ex. R, at 21; Pl.'s Resp. Def.'s Mot. Summ. J. Ex., at 4, DN 32-8). Although Koch claims she left voicemails for Jessie and Steffey on August 19 asking for confirmation that she could come into work on August 21, Jessie and Steffey denied receiving messages from Koch. (Def.'s Mot. Summ. J. Ex. R, at 5; Pl.'s Resp. Def.'s Mot. Summ. J. 3; Koch Dep. 146:22-147:21; Jessie Dep. 11:24-12:20, May 16, 2019, DN 24-22; Steffey Dep. 68:16-69:12). Koch was officially terminated on August 20 based on Steffey's August 17 recommendation. (Def.'s Mot. Summ. J. Ex. N, at 2, DN 24-15).

Koch brought the current KCRA and FMLA action in Kentucky state court on February 20, 2018. (Compl. 6). Thames removed the action to this Court on April 2, 2018. (Notice

Removal 2, DN 1).  Thames has filed a motion for summary judgment seeking dismissal of all of Koch's claims.  (Def.'s Mot. Summ. J. 3, DN 24).

## II.     JURISDICTION

Jurisdiction in this action is based on federal question and supplemental jurisdiction.  Koch asserts claims under federal law, specifically, the FMLA.  *See* 28 U.S.C. § 1331; (Compl. ¶¶ 28-31, DN 1-2; Mem. Supp. Removal 5-6, DN 1-1).  Supplemental jurisdiction affords jurisdiction over Koch's state law KCRA claims.  *See* 28 U.S.C. § 1367(a).

## III.     STANDARD OF REVIEW

In ruling on a motion for summary judgment, the Court must determine whether there is any genuine issue of material fact that would preclude entry of judgment for the moving party as a matter of law.  *See* Fed. R. Civ. P. 56(a).  The moving party bears the initial burden of stating the basis for the motion and identifying evidence in the record that demonstrates an absence of a genuine dispute of material fact.  *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  If the moving party satisfies its burden, the non-moving party must then produce specific evidence proving the existence of a genuine dispute of fact for trial.  *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 247-48 (1986).

While the Court must view the evidence in the light most favorable to the non-moving party, the non-moving party must do more than merely show the existence of some "metaphysical doubt as to the material facts."  *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 586 (1986) (citation omitted).  Rather, the non-moving party must demonstrate that a genuine factual dispute exists by "citing to particular parts of the materials in the record" or by "showing that the materials cited do not establish the absence . . . of a genuine dispute . . . ."  Fed. R. Civ. P.

56(c)(1). "The mere existence of a scintilla of evidence in support of the [non-moving party's] position will be insufficient" to overcome summary judgment. *Anderson*, 477 U.S. at 252.

## IV.    DISCUSSION

Koch asserts disability and retaliation claims under the KCRA and interference and retaliation claims under the FMLA. (Compl. ¶¶ 18-27, 28-31, DN 1-2). Generally, when both federal and state law claims are before a federal court, a federal court is to apply federal law to the plaintiff's federal law claims and state substantive law to the state law claims. *Super Sulky, Inc. v. U.S. Trotting Ass'n*, 174 F.3d 733, 737, 741 (6th Cir. 1999) (citations omitted).

### A.    FMLA Interference Claim

Under the FMLA, it is "unlawful for employers to interfere with or deny an employee's exercise of her FMLA rights . . . ." *Bryson*, 498 F.3d at 570 (internal citations omitted) (citation omitted). In this case, Koch argues that Thames interfered with her FMLA rights by firing her when Thames should have granted her FMLA leave. (Pl.'s Resp. Def.'s Mot. Summ. J. 24-25).

#### 1.    *Prima Facie Claim*

To establish a prima facie claim of FMLA interference, the employee must prove that: (1) she is an eligible employee, (2) the defendant is an employer, (3) she "was entitled to leave under the FMLA," (4) she "gave the employer notice of [her] intention to take leave," and (5) "the employer denied the employee FMLA benefits to which [she] was entitled." *Wysong v. Dow Chem. Co.*, 503 F.3d 441, 447 (6th Cir. 2007) (citations omitted). Thames argues that Koch cannot prove her FMLA interference claim for two reasons: (1) Koch does not suffer from a "serious health condition" to be entitled to FMLA leave; and (2) Koch failed to appropriately give Thames notice of her intention to take leave. (Def.'s Mot. Summ. J. 15).

### a. Entitlement to Leave Under the FMLA

"A plaintiff cannot establish a prima facie case of FMLA interference without demonstrating that she suffered from a 'serious health condition'" to satisfy the third element of a prima face FMLA interference claim, i.e. that the employee was entitled to FMLA leave. *Taylor v. Autozoners, LLC*, 706 F. Supp. 2d 843, 848 (W.D. Tenn. 2010) (quoting *Morris v. Family Dollar Stores of Ohio, Inc.*, 320 F. App'x 330, 337 (6th Cir. 2010)). A "serious health condition" is defined as "an illness, injury, impairment, or physical or mental condition that involves (A) inpatient care in a hospital, hospice, or residential medical care facility; or (B) continuing treatment by a health care provider." 29 U.S.C. § 2611(11)(A)-(B). Koch concedes that she cannot prove a "serious health condition" under subsection (A) because there is no evidence of record that Koch received inpatient care for her mental conditions. (Def.'s Mot. Summ. J. 19; Pl.'s Resp. Def.'s Mot. Summ. 25). Rather, Koch believes she has proven a serious health condition under subsection (B), i.e., that Koch possessed an "impairment . . . that involve[d] . . . continuing treatment by a health care provider."

When it is undisputed that the plaintiff suffers from an impairment or mental condition, courts "focus [their] attention on what is required to prove 'continuing treatment by a health care provider.' To answer that question, [courts] consult the regulations prescribed by the Secretary of Labor and the definition of 'serious health condition' therein." *Thorson v. Gemini, Inc.*, 205 F.3d 370, 376 (8th Cir. 2000) (directing Secretary of Labor to "prescribe such regulations as are necessary to carry out" the FMLA (quoting 29 U.S.C. § 2654)). 29 C.F.R. § 825.115 outlines the definition of "continuing treatment" and requires a "period of incapacity." *See Hansen v. Fincantieri Marine Grp, LLC*, 763 F.3d 832, 836 (7th Cir. 2014) ("A 'serious health condition' is defined in part as . . . a 'period of incapacity . . . .'" (quoting 29 C.F.R. 825.115 (2009))). As such,

"'incapacity' is a requirement all FMLA plaintiffs must show." *Whitaker v. Bosch Braking Sys. Div. of Robert Bosch Corp.*, 180 F. Supp. 2d 922, 929 (W.D. Mich. 2001) (citations omitted); *see also Lackey v. Jackson Cty.*, 104 F. App'x 483, 489 (6th Cir. 2004) ("Plaintiff has failed to establish that he had a 'serious health condition' under [federal regulations] because he has produced no evidence that he had a period of incapacity relating to his [impairment] . . . ."). "The term incapacity means inability to work, attend school or perform other regular daily activities due to the serious health condition, treatment, therefore, or recovery therefrom." 29 C.F.R. 825.113(b).

Koch has presented no evidence to meet the "period of incapacity" requirement apart from her own statements. When "[t]he only testimony in the record suggesting that the plaintiff was unable to work was from the plaintiff herself[,] [s]uch testimony is not enough to prove incapacitation." *Joslin v. Rockwell Int'l Corp.*, 8 F. Supp. 2d 1158, 1160-61 (N.D. Iowa 1998) (citing *Olsen v. Ohio Edison Co.*, 979 F. Supp. 1159, 1165 (N.D. Ohio 1997) (stating that one's own claim that one cannot work because of illness is not sufficient to show incapacity under the FMLA); *Brannon v. OshKosh B'Gosh, Inc.*, 897 F. Supp. 1028, 1037 (M.D. Tenn. 1995) (stating that the plaintiff's testimony that she was too sick to work was insufficient to satisfy her burden on summary judgment)). "Under the FMLA, a plaintiff employee must be able to show that a health provider made a professional assessment of [her] condition and determined, based on that assessment, that an extended absence from work was necessary." *Joslin*, 8 F. Supp. 2d at 1161 (quoting *Olsen*, 979 F. Supp. at 1166) (internal quotation marks omitted). The only objective evidence Koch points to in an attempt to establish incapacity is Lemon's August 17 letter. Lemon admitted, however, that she asked Thames to excuse Koch from work *only because Koch requested it.* (Lemon Dep. 40:2-5). Lemon testified that she did not make an assessment that Koch was incapacitated, but only spoke with Koch over the phone and was asked by Koch to provide a work

excuse after Koch had missed several days from work. (Lemon Dep. 39:18-42:17). There is no other evidence that Koch suffered from a "period of incapacity" at any time temporally proximate to the week of August 14-18.

Because Koch fails to provide any valid evidence of incapacitation and has not shown continuing treatment by a health care provider as a result of her purported impairments, her FMLA interference claim fails. *See Lackey*, 104 F. App'x at 489; *Whitaker*, 180 F. Supp. 2d at 929.

### b.    Notice

"[T]he critical test for substantively-sufficient notice is whether the information that the employee conveyed to the employer was reasonably adequate to apprise the employer of the employee's request to take leave for a serious health condition that rendered him unable to perform his job." *Brenneman v. MedCentral Health Sys.*, 366 F.3d 412, 421 (6th Cir. 2004) (citations omitted). "While an 'employee need not expressly assert rights under the FMLA or even mention the FMLA,' the employee must give 'the employer enough information for the employer to reasonably conclude that an event described in FMLA has occurred.'" *Walton v. Ford Motor Co.*, 424 F.3d 481, 486 (6th Cir. 2005) (citations omitted). "What is practicable, both in terms of the timing of the notice and its content, will depend upon the facts and circumstances of each individual case." *Cavin v. Honda of Am. Mfg., Inc.*, 346 F.3d 713, 723 (6th Cir. 2003), *superseded by statute on other grounds as recognized by Wallace v. FedEx Corp.*, 764 F.3d 571, 585 (6th Cir. 2014) (quoting *Manuel v. Westlake Polymers Corp.*, 55 F.3d 758, 764 (5th Cir. 1995)).

The only evidence that Koch provided Thames with the requisite notice of her intent to take FMLA leave is her text message allegedly sent to Steffey on August 16 at 6:27 p.m., stating: "I've been afraid to leave my house this week. My NP put me on a $1000/mo med and ran out of

samples, it hit me hard Sunday."[3]  (Def.'s Mot. Summ. J. Ex. R, at 3; Pl.'s Resp. Def.'s Mot. Summ. J. Ex., at 3, DN 32-8).  Koch's purported notice is similar to the notice given by the employee in *Beaver v. RGIS Inventory Specialists, Inc.*, 144 F. App'x 452 (6th Cir. 2005):

> [Plaintiff's] phone conversations with [employer] did not provide [employer] with enough information to conclude that [Plaintiff] needed FMLA leave.  [Plaintiff] used very general terms when describing her health such as she "didn't feel good," was "sick," and "needed a couple of days to get better, a few days."  Likewise, the note [Plaintiff] provided did not provide sufficient notice because it stated only that [Plaintiff] would "need to put off returning home (& to work) for a few days."  When [Plaintiff] returned to work on Monday, . . . she did not indicate that she could not work due to illness.  The only reference to her health in the . . . interview with [employer] is [Plaintiff's] response that she felt a "little bit" better than she did when she was in Oregon when [employer] asked her if she was feeling better.

*Id*. at 456-57.  Koch's August 14 text message advised Steffey would be late to work because of an appointment for a wrist injury.  Koch claims she advised Steffey on August 15 that she could not work the rest of the week but did not give any reason, and on August 16, she reportedly sent Steffey a message that she was afraid to leave her house because of a lack of medication for some unspecified condition.  (Pl.'s Resp. Def.'s Mot. Summ. J. Ex., at 3, DN 32-8; Koch Dep. 142:21-143:4).  Although she asserts that Thames employees were aware that she had experienced psychological problems, Koch did not link those impairments to her absence in either message on August 15 or August 16.  Koch instead provided no specifics as to what she was referring to, like the plaintiff's description in *Beaver* of medical ailments only in "very general terms," nor did Koch state she could not work.  If the employee's statement in *Beaver* that she "needed a couple of days to get better" did not indicate that an employee "could not work due to illness[,]" then Koch's assertion that she was afraid to leave her home similarly does not constitute proper notice of an FMLA leave request.

---

[3] Koch does not assert that her August 15 call to Steffey constituted proper FMLA leave notice.

Furthermore, Koch's notice was untimely. *See Gilliam v. United Parcel Serv., Inc.*, 233 F.3d 969, 971 (7th Cir. 2000) ("[T]he FMLA does not provide for leave on short notice when longer notice readily could have been given."); *see also Rodriguez v. Smithfield Packing CO., Inc.*, 545 F. Supp. 2d 508, 515-16 (D. Md. 2008) ("The core requirements for triggering an employer's obligations [under the FMLA include] *adequate communication*, meaning a timely communication sufficient to put an employer on notice that the protections of the Act may apply. When timely and adequate communication is not given, the protections of the Act do not apply, even if the employee in fact has a serious health condition.") (citations omitted) (emphasis in original). "[I]f the need for [FMLA] leave is foreseeable[,] . . . notice must be given as soon as practicable." 29 C.F.R. § 825.302(a). "As soon as practicable means as soon as both possible and practical, taking into account all of the facts and circumstances in the individual case. When an employee becomes aware of a need for FMLA leave less than 30 days in advance, it should be practicable for the employee to provide notice of the need for leave either the same day or the next business day." 29 C.F.R. § 825.302(b). Koch has not argued that her need for leave was "unforeseeable[,]" which would somewhat relax the FMLA leave notice requirements. 29 C.F.R. § 825.303(a)-(c). Nor could she, considering that she admitted in her August 16 text message that she was "hit . . . hard on Sunday[,]" August 13, the day before she was scheduled to work on August 14. With Koch's reported onset occurring on Sunday, it was foreseeable that she may need time off of work at that time. Her failure to give notice is incongruent with the instruction of 29 C.F.R. § 825.302(a) that "notice must be given as soon as practicable."

Finally, even assuming that the effects of Koch's psychological condition on her ability to work were "unforeseeable[,]" 29 C.F.R. § 825.303(c) states that Koch "must comply with the employer's usual and customary notice and procedural requirements for requesting leave, absent

unusual circumstances." There is no proof to support Koch's claim that her "major depressive episode and fear to leave her house" justified her failure to abide by Thames' notice requirements. As Thames points out, "[o]ver the course of the week [of August 14 through 18], Koch sent and received 702 text messages and placed and received over 10 phone calls to a variety of third parties." (Def.'s Mem. Supp. Mot. Summ. J. 6; Def.'s Mot. Summ. J. Ex. R, at 2-23). Any insinuation that Koch was unable to contact her employer before August 16 is unavailing in light of her phone records evidencing extensive communications with others through electronic means. *See generally Acker v. Gen. Motors, LLC*, 853 F.3d 784, 789-90 (5th Cir. 2017) (rejecting claim of unusual circumstances when employee could not explain why "'unusual circumstances' left him capable of calling one line, but not the other . . . .").

Koch's FMLA interference claim fails for insufficient and untimely notice. The Court will grant summary judgment on this claim.

### B.     KCRA Disability Claim

"The language of the KCRA mirrors that of the ADA; consequently, claims brought under the KCRA are interpreted consistently with the standards developed under the ADA." *Bryson v. Regis Corp.*, 498 F.3d 561, 574 (6th Cir. 2007) (internal citation omitted) (citations omitted); *see also Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 592 (Ky. 2003) ("The Kentucky Civil Rights Act was modeled after federal law, and our courts have interpreted the Kentucky Act consistently therewith." (citations omitted)). The Kentucky Court of Appeals in *Hallahan v. The Courier-Journal*, 138 S.W.3d 699 (Ky. App. 2004), outlined the analysis for KCRA disability discrimination claims:

> Under KRS 344.040(1), it is unlawful for an employer to discharge or otherwise
> discriminate against an individual with respect to compensation, terms, conditions
> or privileges of employment because the person is a "qualified individual with a

disability." The plaintiff bears the initial burden of establishing a prima facie case of disability discrimination against the defendant.

*Id.* at 706. In addition, the court noted:

> The Sixth Circuit Court of Appeals has created two procedural sets of criteria for establishing a disability discrimination claim based on the use of direct or circumstantial evidence. . . . Where the plaintiff relies on circumstantial evidence, he may present a prima facie case of disability discrimination by showing: (1) he is disabled; (2) he is "otherwise qualified" for the position with or without reasonable accommodation; (3) he suffered an adverse employment decision; (4) the employer knew or had reason to know of the plaintiff's disability; and (5) the position remained open while the employer sought other applicants or the disabled plaintiff was replaced. The employer must then offer a legitimate explanation for its action. If the employer satisfies this burden of production, the plaintiff must introduce evidence showing that the proffered explanation is pretextual. The latter prima facie scheme is derived from the burden shifting approach developed for discrimination in *McDonnell Douglas Corp. v. Green*, 411 U.S. 792 (1973).

*Id.* at 706 n.5. In this case, Koch makes no effort to argue that direct evidence proves her KCRA discrimination claim and instead relies on circumstantial evidence. (Pl.'s Resp. Def.'s Mot. Summ. J. 16). Thames asserts that Koch's KCRA disability claim fails for three reasons: (1) Koch has not proven that she has a "disability"; (2) there is no proof that Thames was aware of Koch's purported disability; and (3) Koch has not shown that Thames' decision to terminate her due to her chronic absences was pretextual. (Def.'s Mot. Summ. J. 10).

### 1.    *Prima Facie Case*

Thames contends that Koch cannot establish a prima facie case of KCRA disability discrimination using circumstantial evidence. While seemingly conceding satisfaction of some prima facie elements, Thames argues that Koch has not proved that she had a disability at the time of her termination. (Def.'s Mem. Supp. Mot. Summ. J. 10, DN 24-1).

Under the KCRA, the term "disability" is defined to include: (a) a physical or mental impairment that substantially limits one or more of the major life activities of the individual; (b) a record of such impairment; or (c) being regarded as having such an impairment. *See* KRS

344.010(4). Koch has submitted evidence that she suffers from "Attention-deficit hyperactivity disorder, combined type" and "Major depressive disorder, recurrent severe without psychotic features," and has received treatment for both conditions throughout her life.[4] (Pl.'s Resp. Def.'s Mot. Summ. J. Ex., at 1, DN 32-1; Pl.'s Resp. Def.'s Mot. Summ. J. Ex., at 2, DN 32-2). Citing to the website of the National Institute of Mental Health ("NIMH"), Koch states that she "deals with symptoms including severe and persistent inattention, impulsivity, hyperactivity, and episodes of intense depression that interfere with her quality of life." (Pl.'s Resp. Def.'s Mot. Summ. J. 2). Koch testified that without her medicine she becomes "incapacitated mentally" and "overall could not function." (Koch Dep. 114:3-14). Nurse Practitioner Lemon testified that Koch told her that she was without her medication during the week she was fired and "did not feel safe to take care of patients in the mindset that she was in." (Lemon Dep. 39:6-40:1, May 29, 2019, DN 24-18). Koch has also produced a letter Lemon wrote on October 6, 2016, recommending Koch for electroconvulsive therapy ("ECT") because Koch "ha[d] been extremely resistant to numerous medications, having increased side effects or simply no efficiency." (Pl.'s Resp. Def.'s Mot. Summ. J. Ex., DN 32-3).

### a. Disability

Under the pre-ADAAA standard applied by Kentucky courts,[5] "a person whose . . . mental impairment is corrected by mitigating measures still has an impairment, but if the impairment is

---

[4] Koch has also been diagnosed with Bipolar Disorder but does not relate this condition in support of her claims against Thames. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex., at 2, DN 32-2; Compl. ¶¶ 9-10, 19, 24, DN 1-2).

[5] While the ADA's definition of disability has been revised by the Americans with Disabilities Act Amendments Act, "the KCRA retains the *former* definition of disability[,]" prior to the 2008 Amendments of the federal law." *Larison v. Home of the Innocents*, 551 S.W.3d 36, 43 (Ky. App. 2018) (alteration in original) (emphasis in original) (quoting *Azzam v. Baptist Healthcare Affiliates, Inc.*, 855 F. Supp. 2d 653, 658 n.2 (W.D. Ky. 2012)). Because Kentucky has not adopted the ADA's amendments to the KCRA, "most courts continue to apply pre-2008 ADA

corrected it does not 'substantially limi[t]' a major life activity." *Rose*, 2019 WL 1370849, at *8 n.18 (quoting *Sutton v. United Air Lines, Inc.*, 527 U.S. 471, 483 (1999)). As a sister court has explained regarding the application of this definition, "courts *do* take into account ameliorative effects when assessing whether an individual's impairment substantially limits one or more life activities." *Sanders v. Bemis Co.*, No. 3:16-CV-00014-GFVT, 2017 WL 3401277, at *5 (E.D. Ky. Aug. 8, 2017) (emphasis in original) (citation omitted). "Merely having an impairment does not make one disabled for purposes of the ADA [and KCRA]." *Rose*, 2019 WL 1370849, at *8 (internal quotation marks omitted) (quoting *Toyota Motor Mfg., Ky., Inc. v. Williams*, 534 U.S. 184, 195 (2002), *superseded by statute* Pub. L. No. 110-325, 122 Stat. 3553 (2009)). "Under Kentucky law temporary impairments do not qualify as disabilities." *Larison*, 551 S.W.3d at 43. "An impairment that only moderately or intermittently prevents an individual from performing major life activities is not a substantial limitation under the ADA [or KCRA]." *Rose*, 2019 WL 1370849, at *8 (internal quotation marks omitted) (quoting *Laws v. HealthSouth N. Ky. Rehab. Hosp., Ltd. P'ship*, 828 F. Supp. 2d 889, 913 (E.D. Ky. 2011)).

Although Koch has dealt with Attention Deficit Disorder and Major Depressive Disorder since her adolescence, the record does not reflect the extent of any impairment those conditions may have caused while Koch worked at Greenwood. Koch's general citation to the NIMH's website for general symptoms associated with Koch's conditions is unavailing: "In analyzing whether an impairment substantially limits a major life activity, these two factors should be considered in tandem *with respect to the particular individual claimant* and life activity." *Hallahan*, 138 S.W.3d at 708 (emphasis added); *see also Toyota Motor*, 534 U.S. at 198-99 ("[T]he

---

jurisprudence to KCRA analysis." *Rose v. United Parcel Serv., Inc.*, No. 5:17-CV-378-REW, 2019 WL 1370849, at *6 (E.D. Ky. Mar. 26, 2019) (citations omitted).

[ADA] . . . makes clear that Congress intended the existence of a disability to be determined in such a case-by-case manner. . . . An individualized assessment of the effect of an impairment is particularly necessary when the impairment is one whose symptoms vary widely from person to person.").  Koch has not made any effort to tailor the general laundry list of symptoms identified on the NIMH's website to her daily struggles through any medical proof nor has she pointed the Court to any evidence of record to suggest that she indeed suffers from the listed symptoms, much less what limitations she experiences.

Further, the record reflects that Koch's conditions are almost entirely, if not totally, ameliorated through medication.  Koch described her ability to function without medication as follows:

Q       . . . [S]o what happened as a result of not having your medicine?
A       I became incapacitated mentally.
Q       And when did that happen?
A       Over the weekend before that.
Q       And so when you became incapacitated as you say, . . . what were the symptoms that you were suffering from?
A       Severe anxiety. . . . I could not—I slept and I slept, and just overall could not function.
Q       That was over the weekend before that Monday?
A       Yes.
Q       Did it start on, say, the Saturday?
A       Yes.
Q       Did you contact Cindy Lemon's office?
A       I did to pick up samples the week prior. . . . And they didn't have any.
Q       What caused you to run out and not be able to have enough for the period of time that it was prescribed for?
**A       It was samples that she had been giving me to try, and it was working well.  I didn't have a prescription for it.**
**. . .**
**Q       Once you ran out of the samples, did you immediately start suffering from anxiety and these other symptoms?**
**A       Not immediately.**

(Koch Dep. 114:1-116:6 (emphasis added)).  Lemon testified:

A.     [During the August 14 through 18 work week,] I can remember [Koch]
calling me on the phone.  And she was in distress, saying that she was the worst she
had been in a long time or something to that effect. . . . She was tearful, and
specifically what I remember is that she did not feel safe to take care of patients in
the mindset that she was in. . . . She asked me to write a letter to excuse her from
work. . . . The letter states that we were out of samples and unable . . . to provide
her with [her] medicine . . . .

(Lemon Dep. 38:24-40:20).  In her letter dated August 17, 2017, Lemon stated:

I have been seeing Amity for ADHD and Major Depressive disorder and providing
medication management/individual psychotherapy.  During the time we have been
waiting on insurance to pay for her medication, we were also out of samples and
were unable to provide her with her medication.  We are now able to provide the
medication and ask that you please exclude Amity Koch from work for dates
August 14, 2017 to August 18, 2017.

(Def.'s Mot. Summ. J. Ex. P, at 2, DN 24-17).  Lemon's letter indicates that Koch's inability to

work was related to the lack of medication which Koch specifically stated was "working well."

Lemon's letter from October 2016 recommending ECT Therapy due to the ineffectiveness of

medications was almost one year prior to the August 2017 absences and significantly pre-dates the

successful medication in the intervening period—when the medicine was available.[6]  (Pl.'s Resp.

Def.'s Mot. Summ. J. Ex., at 1, DN 32-3).

This case is analogous to the Sixth Circuit's decision in *Atwell v. Hart County*, 122 F.

App'x 215 (6th Cir. 2005), which found that an individual suffering from "paranoid schizophrenia,

acute psychosis, impulse-control disorder, and polysubstance abuse" did not qualify as disabled

under the KCRA:

In order to prove a violation of the ADA and the parallel provisions of the Kentucky
Civil Rights Act in the context of detention in a county jail, Appellant . . . would
have been required to establish that he suffered from a physical or mental
impairment that placed a "substantial" limitation on a major life activity, such as
walking, seeing or hearing.  The limitation must be permanent or long-term.

---

[6] Koch cites her own interrogatory answer that she "will continue to need medical management
and/or an episode of electric shock therapy as determined per Ms. Lemon", but there are no medical
records cited in support of this assertion.

None of the evidence identified by Appellant . . . in connection with his disability discrimination claims would have supported a finding that his mental impairments impose permanent or long-term limitations on any major life activity. The evidence that [Appellant's] impairments may be corrected or mitigated by medication is not disputed and, in this case, precludes his establishing that his impairments substantially limit him in a major life activity. The district court did not err, therefore, in granting summary judgment to Appellees with respect to Appellant['s] claims under the . . . Kentucky Civil Rights Act.

*Id*. at 218-19 (citations omitted). Like in *Atwell*, the evidence that Koch's impairments can be mitigated by medication is not disputed, which precludes Koch from establishing that these impairments substantially limit a major life activity. *Id*. Koch readily admits that the medication Lemon gave her worked well. (Koch Dep. 114:1-115:3); *Larison*, 551 S.W.3d at 43; *Rose*, 2019 WL 1370849, at *8 (quoting *Laws*, 828 F. Supp. 2d at 913). In the absence of any medical proof showing some substantial limitations related to her mental condition, Koch has not established a genuine issue of material fact as it relates to the existence of a "disability" under KRS 344.010(4)(a).

### b.  Record of Disability

Nor has Koch satisfied the definition of disability under KRS 344.010(4)(b), i.e. having "a record of such impairment." "A record of an impairment means an individual has 'a history of, or has been misclassified as having, a mental or physical impairment that substantially limits one or more major life activities.'" *MX Grp., Inc. v. City of Covington*, 293 F.3d 326, 339 (6th Cir. 2002) (citation omitted). As this Court explained in *Laferty v. United Parcel Service, Inc.*, 186 F. Supp. 3d 702, 710 (W.D. Ky. 2016),

[C]laims under [KRS] 344.010(4)(b) (based upon a record of impairment) would appear to succeed or fail for many of the same reasons under [KRS] 344.010(4)(a) (based upon actual impairment), "because both require a predicate showing of a mental or physical impairment that substantially limits one or more major life activities."

*Id.* (quoting *Edwards v. Ford Motor Co.*, 218 F. Supp. 2d 846, 851 (W.D. Ky. 2002)). So, once "[t]he Court has already determined that [Plaintiff] has no actual-disability claim under [KRS 344.010(4)(a) because his [disability] do[es] not substantially limit [his] major life activities . . . [f]or those same reasons, the record-of-disability prong is unavailing to him too." *Id.* at 710–11 (citing *Olds v. United Parcel Serv., Inc.*, 127 F. App'x 779, 782 (6th Cir. 2005); *DePrisco v. Delta Air Lines, Inc.*, 90 F. App'x 790, 794-95 (6th Cir. 2004)). Koch has not shown any actual disability and has similarly failed to prove the extent or duration of any limitation she may have experienced.

### c.        Being Regarded as Disabled

Koch is lastly unable to satisfy the definition of disability under KRS 344.010(4)(c), i.e., "being regarded as having such an impairment." "To succeed upon a regarded as disabled claim, plaintiff must 'demonstrate that an employer thought he was disabled, [and] that the employer thought that his disability would prevent him from performing a broad class of jobs." *Howard Baer, Inc. v. Schave*, 127 S.W.3d 589, 594 (Ky. 2003) (quoting *Ross v. Campbell Soup Co.*, 237 F.3d 701, 709 (6th Cir. 2001)). Koch points to several pieces of evidence to satisfy this standard, first Steffey's testimony about Koch's purported impairments:

> Q.      . . . Can you tell me when you first became aware that Ms. Koch had attention deficit disorder?
> A.      I don't remember the date. I know she's had small talk in the office, as far as when we were discussing treatment plans for a patient. And she would talk really fast, and then she would start talking on another subject and would say, "squirrel." And we laughed, and she was like, "I was thinking of something else at the time." And she would say, "That's my attention deficit disorder," and it was kind of a joke that she presented with.

(Steffey Dep. 35:8-20). Koch also claims that an administrator at Greenwood, Jonathan McGuire, "inquired on two separate occasions whether Plaintiff had ADHD/ADD" and that she told Steffey of her attention deficit issues and depression. (Pl.'s Resp. Def.'s Mot. Summ. J. Ex. at 5, DN 32-2).

Koch next points to Jessie's testimony:

> Q.      As you sit here today, you're not aware of any medical issues that she had?
> A.      Not from [Koch] personally.  I've heard other people talk about them, but I have never heard that come out of her mouth or—it's just hearsay.
> Q.      I understand, but as far as—what have you heard other people say?
> A.      That she was scattered but that's about it.
> Q.      Okay.  And when we're talking about other people, are you talking about other –
> A.      Nurses on the floor, yeah.

(Jessie Dep. 10:1-12).

Finally, Koch points to a drug screening she took just before she first began working at Greenwood on March 29, 2016, revealing that she was taking the prescription drug Adderall, from which Koch believes Thames should have inferred her ADHD impairment.  (Pl.'s Resp. Def.'s Mot. Summ. J. Ex., at 3, DN 32-5).  A subsequent drug test on April 6, 2017, however, revealed no trace of Adderall in Koch's system.  (Def.'s Reply Mot. Summ. J, Ex. X, at 3, DN 40-3).

Even assuming that this evidence reveals that Thames knew about Koch's conditions, Koch has not identified any evidence that Thames thought that Koch's disabilities prevented her from performing a broad class of jobs.  *See Schave*, 127 S.W.3d at 594.  Koch never requested any accommodations, and there is no evidence that Koch's job duties were modified in any way during the entire time she was employed by Thames.  The only change in job duties was to a different shift, which Koch requested "because she was unhappy working night shifts[,]" not because of any purported impairment.  (Pl.'s Resp. Def.'s Mot. Summ. J. 3).

Koch has failed to link her termination with any purported belief that Thames thought she was disabled.  Koch's history of working at Greenwood suggests that Thames actually believed the opposite—i.e., that she would still be able to work at full capacity despite any mental impairments.  Assuming the truth of Koch's contention that "Koch's psychiatric disabilities were no secret at Greenwood[,]" Koch remained a Greenwood employee from April 2016 to January

2017 without accommodation. (Def.'s Mot. Summ. J. Ex. A, at 2, DN 24-2). Koch was subsequently rehired in April 2017. (Steffey Dep. 36:24-37:5). Moreover, as explained below, the evidence of record shows that Koch's eventual termination stemmed from Koch's failure to work her assigned shifts, not from a belief of any Thames employee that Koch could not work due to any mental impairment.

In sum, Koch has not proven a "disability" as defined by KRS 344.010(4), which defeats her KCRA claim. Accordingly, the Court will grant summary judgment on this claim.

### C.      KCRA and FMLA Retaliation Claims

To survive summary judgment on a claim of retaliation under the FMLA and KCRA, a plaintiff must demonstrate: (1) she engaged in a protected activity, (2) her employer knew of that activity, (3) the employer thereafter took an adverse employment action, and (4) a causal connection exists between the protected activity and the adverse action. *See, e.g.*, *Seegar v. Cincinnati Bell Tel. Co.*, 681 F.3d 274, 283 (6th Cir. 2012) (FMLA); *Charalambakis v. Asbury Univ.*, 488 S.W.3d 568, 583 (Ky. 2016) (KCRA). "If the plaintiff establishes a *prima facie* case of retaliation, the burden shifts to the defendant to establish a legitimate, nondiscriminatory reason for the adverse employment action. The plaintiff . . . bears the ultimate burden of proving that the proffered reason for the action was merely a pretext for discrimination." *Penny v. United Parcel Serv.*, 128 F.3d 408, 417 (6th Cir. 1997).

Koch's retaliation claims fail for much of the same reasons as her previous claims. Regarding Koch's KCRA retaliation claim, she cannot establish a prima facie case because she has not demonstrated that she engaged in a protected activity nor that a causal connection exists between the protected activity and her termination. First, "[t]o be engaged in a protected activity under the KCRA, the plaintiff must contest an unlawful employment practice." *Kruger v. Home*

*Depot USA, Inc.*, 674 F. App'x 490, 495 (6th Cir. 2017). Importantly, "[t]aking FMLA leave is not a protected activity for the purposes of the KCRA anti-retaliation provision." *Stanley v. Haier US Appliance Sols., Inc.*, No. 3:19-CV-00640-CRS, 2020 WL 718232, at *2 (W.D. Ky. Feb. 12, 2020). In order to satisfy the first element of a KCRA retaliation claim, Koch must have in some way challenged an adverse employment action taken against her because of her impairments before her termination. Koch points to nothing of the sort, besides her purported request for FMLA leave, which is insufficient to satisfy the requisites for a KCRA retaliation claim. (Pl.'s Resp. Def.'s Mot. Summ. J. 22-23).

Regarding her FMLA retaliation claim, Koch once again cannot establish a prima facie case, as she has not shown that Thames knew of her protected activity and that a causal connection exists between the protected activity and the adverse action. Koch also fails the "causal connection" prong of her KCRA retaliation claim for the same reasons: her August 16 text message did not provide sufficient notice of the taking of FMLA leave. "[C]ircumstantial evidence of causation . . . requires proof that . . . the decision-maker responsible for making the adverse decision was aware of the protected activity at the time that the adverse decision was made . . . ." *Powell*, 486 S.W.3d at 258 (citations omitted) (internal quotation marks omitted). As previously explained, Koch's August 16 text message cannot reasonably be viewed as informing Steffey that Koch was asking for FMLA leave, so it cannot be said that Thames was "aware" of such a request. Additionally, even if the August 16 text message or Lemon's August 18 letter are viewed as a proper request for FMLA leave, "[n]o FMLA violation [i.e., either an interference or retaliation claim] occurs where an employer has already decided to terminate the employee before the employee requests FMLA leave." *Kennebrew v. N.Y. City Hous. Auth.*, No. 01 CIV 1654 (JSR) (AJP), 2002 WL 265120, at *19 (S.D.N.Y. Feb. 26, 2002) (citations omitted); *see also Beno v.*

*United Tel. Co. of Fla.*, 969 F. Supp. 723, 726 (M.D. Fla. 1997) ("Before [plaintiff] requested medical leave, her supervisors had already . . . recommended her termination. Thus, [plaintiff's] allegation of pretext—that she was terminated because of her request for medical leave—is undermined by the undisputed fact that [the employer's] steps toward termination were already underway before [plaintiff] requested leave," and thus, she did not establish a prima facie case for an FMLA violation); *Tuberville v. Pers. Fin. Corp.*, No. 3:95CV150, 1996 WL 407571, at *3 (N.D. Miss. June 5, 1996) ("In a case such as this, with a well-documented history of unsatisfactory performance, and where the wheels of termination were put in motion before the request for leave," the FMLA provision requiring employer to restore employee to prior job does not apply).

It is undisputed here that Steffey initially filled out the disciplinary notice calling for discharge on August 15. (Def.'s Mot. Summ. J. Ex. O, at 2; Steffey Dep. 27:25-28:4, 29:24-30:2). Steffey only delayed the implementation of the termination to give Koch an opportunity to contact her, which Steffey maintains Koch never did. (Steffey Dep. 28:1-20). Steffey then recommended Koch's termination on August 17. (Def.'s Mot. Summ. J. Ex. L, at 2). The "wheels of termination" thus began turning on August 15 and the termination die was cast on August 17. *See Beno*, 969 F. Supp. at 726 (wheels of termination began turning upon supervisor's recommendation of termination); *see also Land v. S. States Coop., Inc.*, 740 F. App'x 845, 850 (6th Cir. 2018) (affirming summary judgment on Title VII retaliation claim because employer "had already begun to consider terminating [employee] several days before" employee engaged in protected activity and because employer "documented its concerns with [employee's] job performance nearly two months before [employee's] termination"). "[T]emporal proximity is insufficient in and of itself to establish that the employer's nondiscriminatory reason for discharging an employee was in fact pretextual." *Skrjanc v. Great Lakes Power Serv. Co.*, 272 F.3d 309, 317 (6th Cir. 2001) (citations

omitted).  "Evidence that the employer had been concerned about a problem before the employee engaged in the protected activity undercuts the significance of the temporal proximity."[7] *Smith v. Allen Health Sys.*, 302 F.3d 827, 834 (8th Cir. 2002) (citation omitted).  Given Koch's unexcused absences prior to Steffey's recommended termination of August 17, the delivery of Lemon's work excuse on August 18 cannot support an FMLA retaliation claim.  (Steffey Dep. 26:11-15, 30:3-20; Def.'s Mot. Summ. J. Ex. L, at 2).

## V.  <u>CONCLUSION</u>

For the reasons set forth above, **IT IS HEREBY ORDERED**:

1.      Defendant's Motion for Summary Judgment (DN 24) is **GRANTED**.  All of Plaintiff's claims against Defendant are **DISMISSED WITH PREJUDICE**.

2.      Defendant's Motions in Limine (DN 25, 26) are **DENIED AS MOOT**.

3.      Plaintiff's Motions in Limine (DN 27) are **DENIED AS MOOT**.

4.      The Clerk shall strike this matter from the active docket.

Greg N. Stivers, Chief Judge

United States District Court

March 31, 2020

cc:     counsel of record

---

[7] The parties have filed competing motions in limine should Thames' motion for summary judgment be denied.  (DN 25, 26, 27).  In light of the Court granting summary judgment for Thames, these motions will be denied as moot.